## MUTUAL LIFE INS. CO. OF NEW YORK v. SAYRE.

No. 5579.

Circuit Court of Appeals, Third Circuit.

Oct. 17, 1935.

Arthur G. Dickson, of Philadelphia, Pa. (Frederick L. Allen, of New York City, of counsel), for appellant.

Ruby R. Vale and John W. Dickerson, both of Philadelphia, Pa., for appellee.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

DAVIS, Circuit Judge.

The Mutual Life Insurance Company issued on the life of James R. Sayre three policies of a face value of $1,000, $25,000, and $25,000, respectively. They were in force on January 7, 1931. The policy for $1,000 and one for $25,000 provided for the payment of double the face value of the policies in the case of death occurring solely as the result of external, violent, and accidental means. The plaintiff, Edna B. Sayre, the wife of James R. Sayre, was the beneficiary in the policies.

On the evening of January 6, 1931, Mr. Sayre played the card game of contract bridge at the Penn Athletic Club, in Philadelphia, until nearly 1 o'clock in the following morning. He left the club shortly thereafter and took one of the players in a roundabout way, to prolong

a discussion of the principles of the game, to the vicinity of the home of the player, at or near Twenty-First and Pine streets. The insured remarked casually, as he bade his passenger good night, that he would be at home, in Wynnewood, within fifteen minutes or so, and he drove his large car when last seen north on Twenty-First street, from Pine street, in the general direction of his home.

The insured did not reach his home. He was not seen thereafter alive, and an intensive search and check failed to reveal a trace of him or his car.

On May 5, 1933, two young men discovered a human torso lying in a pool of water or gully on the bank of the Schuylkill river, near the confluence with the Delaware river. The body was without head, arms, left foot, and the right leg below the knee. The flesh of the torso was in an advanced stage of decomposition with certain of the internal organs missing. It was covered with grease and tar and contained in cavities therein considerable dirt, leaves, and sticks.

There was no clothing on the torso except a leather belt which was around the middle above the hips. This belt was held together by a gold buckle on which the initials "J. R. S." were engraved.

Two autopsies were made of the body; and the several physicians who attended them, including two of the representatives of the defendant, were of the opinion that the torso was that of an adult male of about forty years of age and between five feet six and one-half inches and five feet eight inches in height. They were further of the opinion that the body had been in the water for a long period of time, for more than one year, at least, but no definite period of time could be established. Dr. Wadsworth, a physician of wide experience, said that his "best conclusion" was that the body had been in the water "probably over two years."

The insured was about five feet six or six and one-half inches in height and in the forty-first year of his life when he disappeared.

The insurance company refused to pay the insurance, and the plaintiff, Edna B. Sayre, brought this action in assumpsit to recover the face value of the one policy and double the face amount of the other policies on the life of the insured.

The case was tried to the court and a jury which gave its verdict for the plaintiff in the sum of $77,000. After denying a motion for a new trial, the court entered judgment on the verdict and the defendant appealed.

The plaintiff in her statement of claim averred that the insured died on January 7, 1931, at Philadelphia, as a result of bodily injury effected solely through external, violent, and accidental means. The defendant denied the death of the insured, death by accidental means, or that proof of death had been furnished.

Before we need consider the alleged errors of law raised by the appellant, we should determine whether or not there was evidence to support the verdict of the jury. To justify the verdict there must be evidence to sustain the findings that: (1) The torso was that of the insured; (2) the insured died on January 7, 1931; and (3) he died from bodily injury effected solely through external, violent, and accidental means.

1. It is hardly worth while to point out that there is substantial evidence, indeed the preponderance of the evidence, to support the finding of the jury that the torso was that of James R. Sayre. All of the facts, when considered together, point to that conclusion. The physical characteristics and measurements, the state of disintegration of the body, the belt and buckle, readily identifiable, found around the middle of the torso, are sufficient to make the verdict of the jury conclusive on that point.

2. But the question as to when the insured died is more difficult. The plaintiff averred in her statement of claim that the insured died on January 7, 1931. This the defendant denied categorically and the case was submitted to the jury on that theory. The fact that the insured died is now conclusive. The question is whether or not there was substantial evidence to support the finding of the jury that the insured died on January 7, 1931. The persuasive effect of the evidence is for the jury alone to determine.

As we have said, the fact of death is established, and we are now concerned with the question of whether or not there was evidence, and not mere speculation on the part of the jury, to support its

finding as to the time of the death of the insured.

It is true that there is little testimonial or direct evidence of the time of the death. We must examine the facts offered in the evidence below to determine if they are sufficient to sustain the verdict of the jury as to the time of death.

The insured disappeared in the morning of January 7, 1931. His body was found on May 5, 1933, approximately two years and four months after his disappearance. The medical experts could not establish with certainty how long the insured had been dead, and their opinions as to the length of the time that the body of the insured was in the process of disintegration varied from "more than one year" to "probably over two years."

There was evidence that the insured was a person of substantial means, contentedly married, and in good health. He and his wife maintained a home suitable to their stations in life. He was regular and temperate in his habits and thoroughly interested in his surroundings. In short, the evidence strongly repels any reason why he would abandon his home and change his usual mode of living without warning.

The facts (which we will restate) occurring on the night of his disappearance, in the light of the background of the insured's life, indicate the probability of his death on that evening. The insured played contract bridge at his club. He was intensely interested in the principles of the game and played past his usual hour. After the game was ended he leisurely drove one of the players, who was considered an expert, to the vicinity of his home in order to prolong a discussion of the game. When this player thanked the insured for going out of his way to bring him home, the insured casually stated that he would be home in fifteen minutes. Thereupon the insured drove his car north on Twenty-First street from Pine street, which was in the proper direction toward his home. He was not seen alive after that and the whereabouts of his car was never discovered. No one, in his family, or otherwise, ever again heard from him. All of the facilities of investigation of modern police methods were immediately employed to search for him, but no trace was found of him until the discovery of his torso and no trace of his automobile has ever been found.

Furthermore, the fact is established in this case that the insured died and that he died a considerable length of time prior to the discovery of his torso. The state of disintegration of the body is evidence of that fact. One expert medical witness testified that it was his best conclusion that the body had been in the water for a period probably over two years.

Upon consideration of all the facts in this case, we are of the opinion that there was sufficient evidence from which a jury might conclude that Sayre died on or about January 7, 1931. The inference to be drawn from the facts and circumstances makes it probable that the insured died during the night in which he disappeared. Harvey v. Fidelity & Casualty Co., 200 F. 925, 928 (C. C. A. 6); Browne v. New York Life Insurance Co., 57 F.(2d) 62 (C. C. A. 8); Travelers' Insurance Co. v. Bancroft, 65 F.(2d) 963 (C. C. A. 10); Fidelity Mutual Life Association v. Mettler, 185 U. S. 308, 22 S. Ct. 662, 46 L. Ed. 922.

This case does not come within the rules of law applicable to the disappearance of persons who are never thereafter discovered. The rules referring to such disappearances were discussed at length by Judge Stone in Claywell v. Inter-Southern Life Insurance Co., 70 F.(2d) 569 (C. C. A. 8).

3. The appellant finally contends as to the questions of fact that it was error for the court to submit to the jury the issue of whether or not the death of the insured was the result solely of external, violent, and accidental means. This issue raises the question as to whether or not the appellee is entitled to recover twice the face value of two of the policies under double indemnity clauses contained therein.

In the case of an extraordinary disappearance and the subsequent discovery of the dead body of that person under such circumstances as surround this case, we naturally think of suicide or foul play as the cause for the eventuality. But here we have to determine whether or not the insured died as a result of external, violent, and accidental means "of which, except in the case of drowning or asphyxiation, there is evidence by a

visible contusion or wound on the exterior of the body."

The provision in the policies is substantially as follows: "The double indemnity will be payable upon receipt of due proof that the Insured died as a direct result of bodily injury effected solely through external, violent, and accidental means, independently and exclusively of all other causes, and of which, except in the case of drowning or asphyxiation, there is evidence by a visible contusion or wound on the exterior of the body, and that such death occurred (a) within ninety days after the date of such injury; provided that the Double Indemnity shall not be payable if death resulted directly or indirectly from disease or bodily or mental infirmity, or from self-destruction, whether sane or insane, or from military or naval service in time of war, or from any act incident to war, or from engaging in a riot or insurrection, or from committing an assault or felony, or from operating or riding in any kind of aircraft, whether as a passenger or otherwise, except as a fare-paying passenger in a licensed passenger aircraft provided by an incorporated passenger carrier and operated by a licensed pilot on a regular passenger route between definitely established airports."

We have concluded that the verdict of the jury established the facts of the death and the time at which the insured died. We have to determine next whether or not there is evidence from which the jury could conclude that the insured died of a bodily injury inflicted on him by external, violent, and accidental means; it being required that there shall be evidence of the fatal injury in the form of a visible contusion or wound unless he died by drowning or asphyxiation.

The fact of death having been established, there are four possibilities here: The insured died a natural death, he committed suicide, he was killed accidentally, or he was killed by another person.

These possibilities are not supported by direct or testimonial evidence. The question is whether or not the circumstantial evidence presented is sufficient to support a verdict of a jury that the insured died by means within the terms of the policy.

Concerning the logical principles of the admissibility of facts from which an inference is to be drawn to prove another fact, Dean Wigmore says:

"The logical process by which any offered fact is receivable is inductive, in the form: 'Fact A is some evidence from which Fact X may be inferred.'

"The potential defect in this process is that one or more other inferences or explanations of Fact A may be the true one, instead of the one alleged. But there can be no inflexible test of admissibility, in practical logic for judicial trials; since in different classes of facts the law must consider partly the differing views of human experience as to such facts, partly the relative practical availability of stronger facts, and partly the hardship of certain inferences if unfounded.

"The general underlying principle is, for both circumstantial and testimonial evidence: A fact is admissible as evidence of a 'factum probandum,' if the inference desired to be drawn from it to the 'factum probandum' is in human experience fairly capable of belief as possible or probable, having regard in a given case to the greater or less number of other and different inferences to which the fact is also naturally open." Wigmore, Code of Evidence, § 212; Wigmore on Evidence, §§ 30–33.

That general rule refers to the admissibility of evidence by the trial judge in whose hands there is a broad discretion as to the relevancy of facts and matters offered for evidence. The question in an appellate court is whether or not that which is in evidence is substantial proof of the issues determined in the trial court. And in this case if the evidence satisfied the rule as to admissibility and the jury drew logical inferences from it, such inferences must be accepted as proof of the issues by. the appellate court reviewing the case.

There was evidence before the trial court that indicated the probability that the insured died by violence. His failure to reach his home on the night of his disappearance is contrary to every reasonable expectation. A thorough search was made for him. There were no indications of an automobile accident. His automobile was never found. He was in good health. He was extremely interested in a preoccupation with which only a normal man would be concerned

just prior to his disappearance, and he announced his intention casually of going directly home. His body was found over two years later in an advanced stage of decomposition that had been retarded by tar and oil acting as a partial preservative. From all the circumstances in the case, it is possible, but unlikely, that he died a natural death, committed suicide, or that he killed himself accidentally. The probability that he died of violence is strong enough to allow the jury to exclude those or other possibilities and to permit the inference that his death was due to an assault and battery by another person or persons.

If such an inference is drawn, a further one to the effect that the fatal injury was evidenced by a visible contusion or wound is permissible under proper instruction of the court. The plaintiff submitted the following point to the court to charge: "The finding of the dismembered body of the insured is a full compliance with the requirements of the instant policies of double indemnity insurance that there must be markings on the body of external contusions or wounds; and this not only because of the condition of the body, but also for the reason that the policies do not expressly exclude either the condition or production of the body as evidence of an external contusion or wound."

The court affirmed the point and added: "Members of the jury, I affirm that point, but I will again call your attention to the fact that the evidence given by the doctors showed that the dismemberment of the body was caused by disintegration. I affirm that point with that explanation."

We must rely here on medical testimony and observation. The appellee's expert testified that the body of the insured bore no evidence of violence; that the condition of the body was due to normal decomposition; that it was impossible to determine whether or not death was due to drowning or that death had occurred prior to the time the body reached the water.

The court stated unequivocally to the jury that the finding of the "dismembered body" was a "full compliance" with the terms of the policy. There was no evidence to support that instruction. The evidence was to the contrary. It was necessary to establish, not only that the insured died as a direct result of bodily injury effected solely through external, violent, and accidental means, independently and exclusively of all other causes, but that such death, except in the case of drowning and asphyxiation, was evidenced by a visible contusion or wound on the exterior of the body, in order to recover double indemnity. There was no evidence whatever of a visible contusion or wound on the exterior of the body. The undisputed testimony was that the condition of the body was due to normal decomposition. Accordingly, the production of the body was not a "full compliance," as the court charged, with the terms of the policy. This instruction was erroneous and prejudicial to the defendant. Consequently a new trial will be granted as to double indemnity unless the plaintiff files a remittitur for the difference between $77,000, the amount of the judgment, and the face value of the policies, $51,000, with interest thereon from May 5, 1933, when the body was discovered and due proof of death was made, until the day of payment, for under the evidence she is without question entitled to this latter amount.

We have examined and carefully considered the remaining assignments of error relating to the exclusion, effect, and admissibility of evidence and the refusal of the trial court to grant a new trial on the ground of after discovered evidence, and do not find that the court erred in its action upon them.

If a remittitur is filed, the judgment as modified will be affirmed.